**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**(NEW ORLEANS DIVISION)**

| | | |
|---|---|---|
| **THE PARISH OF JEFFERSON,** | * | **CIVIL ACTION NO. 2:18-CV-05252** |
| | * | |
| **Plaintiff,** | * | **JUDGE IVAN L.R. LEMELLE** |
| | * | |
| **versus** | * | **MAGISTRATE JUDGE JOSEPH C.** |
| | * | **WILKINSON, JR.** |
| **CANLAN OIL COMPANY, et al.,** | * | |
| | | **SECTION "B"** |
| **Defendants.** | | |

**Removing Defendant's Opposition to Plaintiffs' Motion to Remand**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PROCEDURAL HISTORY .................................................................................. 3

ARGUMENT ....................................................................................................... 5

      I.      The Removing Defendant Offers Arguments and Evidence to Preserve the Issues Presented in *Plaquemines II* in the Event the Supreme Court Grants Review and Reverses That Decision ................................................................. 5

      II.     Under *Plaquemines II*, Federal-Officer Jurisdiction Exists in this Case. ............. 11

            a.     Plaintiffs' *Rozel* Expert Report Alleges Damage in the Operational Area Caused by Wartime Activities in Other Coastal Areas. ................... 12

            b.     Plaintiffs' Arguments Concerning the Related Refinery Cases Are Meritless. ........................................................................................ 18

CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arizona v. Manypenny*,
 451 U.S. 232 (1981)........................................................................................... 21

*Butler v. Coast Electric Power Association*,
 926 F.3d 190 (5th Cir. 2019) ............................................................................ 20

*Cameron v. Auster Oil & Gas Inc.*,
 No. 2:18-CV-00677, 2022 WL 17852581 (W.D. La. Dec. 22, 2022) ............................... 7

*Exxon Mobil Corp. v. United States*,
 No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ............................... 10

*Hammack v. Baroid Corp.*,
 142 F.3d 266 (5th Cir. 1998) ........................................................................... 21

*Jefferson Cnty. v. Acker*,
 527 U.S. 423 (1999)........................................................................................... 14

*Latiolais v. Huntington Ingalls, Inc.*,
 951 F.3d 286 (5th Cir. 2020) (en banc) ........................................................ 4, 19, 21, 22

*Par. of Plaquemines v. Chevron USA, Inc. (Plaquemines I)*,
 7 F.4th 362 (5th Cir. 2021) ................................................................... 3, 4, 12, 14

*Par. of Plaquemines v. Riverwood Prod. Co.*,
 No. 18-CV-5217, 2019 WL 2271118 (E.D. La. May 28, 2019)........................................ 4

*Par. of Plaquemines v. Riverwood Prod. Co.*,
 No. 18-CV-5217, 2022 WL 101401 (E.D. La. Jan. 11, 2022)................................. passim

*Plaquemines Par. v. Hilcorp Energy Co.*,
 No. 18-CV-05210, ECF No. 91 (E.D. La. Dec. 29, 2022)........................................... 2, 11

*Plaquemines Par. v. Rozel Operating Co.*,
 No. 18-CV-05189, ECF No. 58 (E.D. La. Dec. 29, 2022)........................................... 2, 11

*Plaquemines Parish v. Chevron USA, Inc. (Plaquemines II)*,
 No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (per curiam)................. passim

*St. Charles Surgical Hospital, L.L.C. v. Louisiana Health Service & Indemnity Co. (St.
 Charles II)*, 990 F.3d 447 (5th Cir. 2021)........................................................... 18

*Watson v. Philip Morris Cos.*,
 551 U.S. 142 (2007)................................................................................... 1, 5, 8, 15

*Zeringue v. Crane Co.*,
    846 F.3d 785 (5th Cir. 2017) ........................................................................................ 20

**STATUTES**

28 U.S.C. § 1442 .......................................................................................................... 3, 19, 20

## INTRODUCTION

This case is one of 42 cases filed against approximately 200 oil-and-gas companies challenging their oil-production activities on the Louisiana coast, including during World War II ("WWII"). The briefing of Plaintiffs' motion to remand this case remained on hold pending resolution of *Plaquemines Parish v. Chevron USA, Inc. (Plaquemines II)*, No. 22-30055 (5th Cir.), which resolved an appeal from the lead case in this District: *Plaquemines Parish v. Riverwood Production Company*, No. 18-CV-5217 (E.D. La.) ("*Riverwood*"). In *Plaquemines II*, the Fifth Circuit held that the Defendants in that case ("the *Riverwood* Defendants") did not act under federal officers when they produced oil in the Potash field that was sent to refineries operated by other oil companies that fulfilled government contracts for petroleum products during WWII. 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (per curiam).

Defendant Chevron U.S.A. Inc. ("the removing Defendant")[1] respectfully disagrees with that decision, and the *Riverwood* Defendants have filed a petition for writ of certiorari to the Supreme Court.[2] During WWII, the removing Defendant's predecessors, including its predecessor-in-interest in this case (The California Company), assisted the government by producing massive quantities of oil under a specially-created government agency's "subjection, guidance or control" so refineries could fulfill government contracts for critical war products. The removing Defendant thus was "acting under" federal officers. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007). Accordingly, this Court may wish to defer consideration of Plaintiffs' motion to remand until the Supreme Court resolves the *Plaquemines II* petition, as another section

---

[1] Plaintiffs have correctly alleged that Chevron U.S.A. Inc. is the successor-in-interest to The California Company. *See* Petition for Damages to the Jefferson Parish Coastal Zone ¶ 2, *Par. of Jefferson v. Canlan Oil Co.*, No. 732-771.

[2] *See* Petition for a Writ of Certiorari, *Chevron USA, Inc. v. Plaquemines Parish*, No. 22-715 (U.S. Jan. 30, 2023).

of this Court has already done. *See Plaquemines Par. v. Rozel Operating Co.*, No. 18-CV-05189, ECF No. 58 (E.D. La. Dec. 29, 2022); *Plaquemines Par. v. Hilcorp Energy Co.*, No. 18-CV-05210, ECF No. 91 (E.D. La. Dec. 29, 2022).

The removing Defendant files this brief for two purposes. *First*, this brief and its exhibits provide this Court with the evidence necessary to preserve for appeal the removing Defendant's arguments pending the Supreme Court's resolution of the petition for a writ of certiorari in *Plaquemines II. Second*, this brief and its exhibits provide this Court with additional evidence and arguments made relevant by *Plaquemines II* that support federal-officer jurisdiction in this case. Specifically, the Fifth Circuit recognized that "refineries, who had federal contracts and acted pursuant to those contracts, can likely remove under § 1442 . . . ." *Plaquemines II,* 2022 WL 9914869, at *4. Thus, in a different factual setting where a defendant acted as a producer of crude oil that the same defendant then refined to fulfill government contracts during WWII, those circumstances would give rise to federal-officer jurisdiction.

Here, *Plaquemines II*'s test is satisfied by the removing Defendant's WWII activities in certain related cases where the removing Defendant was both a federally-contracted refiner and a crude-oil producer (the "Related Refinery Cases"). Plaintiffs allege in their *Rozel* Expert Report that the damage in the "operational area" in this case was caused, at least in part, by the removing Defendant's WWII activities in other coastal areas. These WWII activities in other coastal areas are the subject of Plaintiffs' claims in the Related Refinery Cases, and, as explained by the removing Defendants in those cases, were undertaken while the removing Defendants were acting under federal officers. Accordingly, because Plaintiffs' theories of liability in this case implicate the removing Defendant's activities in the Related Refinery Cases, and those activities support federal-officer jurisdiction, Plaintiffs' motion to remand should be denied. Alternatively, this

Court may wish to defer consideration of Plaintiffs' remand motion until after the remand motions in the Related Refinery Cases are resolved.

## PROCEDURAL HISTORY

This case is one of 42 suits with virtually identical allegations, all filed by the same private law firm on behalf of various coastal parishes. The suits seek to use a 1980 state permitting law to challenge, as unlawful, activity that Defendants undertook long before 1980—and as far back as WWII, when a national emergency drove and dictated a massive increase in coastal oil production. The State of Louisiana intervened in all of the cases.

The removing Defendant timely removed this case under 28 U.S.C. § 1442, which permits removal of cases involving federal officers and persons assisting such officers.[3] The removing Defendant based the removal on new allegations in Plaintiffs' *Rozel* Expert Report, which "revealed, for the first time, the specific conduct that the [defendant oil] companies engaged in before 1980 that supported [Plaintiffs'] theory of liability," including the removing Defendant's activities during WWII under the direction and control of federal officers. *Par. of Plaquemines v. Chevron USA, Inc. (Plaquemines I)*, 7 F.4th 362, 373 (5th Cir. 2021).

Plaintiffs in this case and the other 41 cases moved to remand across the docket.[4] Because the jurisdictional issues implicated by the remand motions overlapped but were not identical, the parties briefed one lead case in each district: *Riverwood* in this District and *Cameron v. Auster Oil & Gas Inc.*, No. 2:18-CV-677 (W.D. La.) ("*Auster*"). In the lead case in this District, the *Riverwood* Defendants filed oppositions to Plaintiffs' remand motions on October 19, 2018.[5]

---

[3] *See* ECF No. 1 at 20–31.
[4] *See* ECF No. 25.
[5] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 47 ("Defs. *Riverwood* Opp."); *Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 48.

The *Riverwood* district court granted Plaintiffs' motions to remand, *see Par. of Plaquemines v. Riverwood Prod. Co.*, No. 18-CV-5217, 2019 WL 2271118, at *1 (E.D. La. May 28, 2019), and the *Riverwood* Defendants appealed.[6] The Fifth Circuit remanded for the district court to determine whether federal-officer jurisdiction existed in light of the intervening decision in *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc). *See Plaquemines I*, 7 F.4th at 365.

On remand, the *Riverwood* Defendants submitted supplemental briefing with additional evidence in support of removal to demonstrate that they satisfied the four-part test for federal-officer jurisdiction.[7] That test requires a defendant to show: (1) it is a "'person' within the meaning of the statute"; (2) it has "asserted a colorable federal defense"; (3) it "acted pursuant to a federal officer's directions"; and (4) "the charged conduct is connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296. The district court found that the *Riverwood* Defendants met all but the "acting under" element of this test, and again remanded. *See Par. of Plaquemines v. Riverwood Prod. Co.*, No. 18-CV-5217, 2022 WL 101401, at *6–10 (E.D. La. Jan. 11, 2022).

The *Riverwood* Defendants appealed that order.[8] As noted above, while the Fifth Circuit affirmed in its recent decision in *Plaquemines II*, the *Riverwood* Defendants filed a petition for a writ of certiorari from the Supreme Court seeking review of that decision. Although the Fifth Circuit affirmed the district court's remand order, the Fifth Circuit expressly recognized that federal-officer jurisdiction would likely exist in a case where a removing defendant was a refiner

---

[6] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 88. The removing Defendants in *Auster* also appealed the district court's order granting remand to the Fifth Circuit, which consolidated the *Auster* appeal with the *Riverwood* appeal. *See Plaquemines I*, 7 F.4th at 365.

[7] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 104 ("Defs. *Riverwood* Supp. Opp."); *Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 110.

[8] *See Plaquemines Par. v. Riverwood Prod. Co.*, No. 18-CV-5217, ECF No. 119.

"who had federal contracts and acted pursuant to those contracts." *Plaquemines II*, 2022 WL 9914869, at *4.

On February 6, 2023, Plaintiffs filed a memorandum re-urging their previously filed motion to remand.[9] Before that, briefing of Plaintiffs' motion to remand in this case had remained on hold pending the resolution of the jurisdictional issues in the lead *Riverwood* case.

## ARGUMENT

I.    **The Removing Defendant Offers Arguments and Evidence to Preserve the Issues Presented in *Plaquemines II* in the Event the Supreme Court Grants Review and Reverses That Decision.**

As described above, the *Riverwood* Defendants have sought U.S. Supreme Court review of *Plaquemines II*, and the removing Defendant here expressly preserves the arguments made in support of federal-officer jurisdiction in that case. The *Riverwood* Defendants showed that, during WWII, they engaged in the production practices that Plaintiffs challenge as part of an "unusually close" or "special" relationship with the federal government, in which they massively increased their production of crude oil pursuant to strict government directives to fuel the government's war effort with a minimum use of critical materials under the direction and control of a temporary government agency. *Watson*, 551 U.S. at 151, 153. Indeed, during WWII, "[s]o closely and continuously did [the government and the oil industry] work together, that it is often all but impossible to say where one left off and the other began."[10] Additionally, the *Riverwood* Defendants engaged in the challenged production practices while acting as federal subcontractors, specifically by supplying federally contracted refineries with crude oil essential to produce aviation gasoline ("avgas") and other critical petroleum products needed for the war effort.

---

[9] *See* ECF No. 46-2.
[10] *Plaquemines II* ROA.14212.

To facilitate resolution of Plaintiffs' remaining motion to remand, the parties have stipulated that the appellate record in *Plaquemines II* is part of the record in this case.[11] To avoid burdening the Court with briefing on the issues the Fifth Circuit considered in *Plaquemines II*, the removing Defendant respectfully incorporates by reference the *Riverwood* Defendants' briefing and evidence and expressly preserves the issues and arguments presented in *Plaquemines II* pending the resolution by the Supreme Court of the petition for a writ of certiorari in *Plaquemines II*. The removing Defendant provides below a brief summary of those arguments with reference to the specific facts of this case.

Here, for the reasons set forth more fully in the *Plaquemines II* briefs, all four criteria for federal-officer removal are satisfied. The California Company, the wartime operator in the Barataria field at issue in this case and predecessor to removing Defendant Chevron U.S.A. Inc., is a "person."[12] *See Riverwood*, 2022 WL 101401, at *4 ("There is no dispute that defendants are "persons" within the meaning of the statute."). The California Company has asserted (through its successor) federal defenses of immunity, preemption, due process, and failure to exhaust administrative remedies, all of which are at least "colorable."[13] *See id.* at *6–7 (finding in similar circumstances that the defendants had alleged "colorable" federal-preemption and due-process defenses). The California Company acted pursuant to a federal officer's directions, as explained below, because (1) it had an unusually close and special relationship with the federal government during WWII and (2) it was a federal subcontractor through its supply of crude oil to federally contracted refineries producing avgas and other essential refined petroleum products. Finally, the charged conduct—The California Company's WWII crude-oil production practices in Barataria—

---

[11] *See* ECF No. 42.
[12] Plaintiffs conceded in *Riverwood* that Defendants are persons but contended that the other prongs were not met. *See* Defs. *Riverwood* Opp. at 2.
[13] *See* Defs. *Riverwood* Opp. at 23–25; Defs. *Riverwood* Supp. Opp. at 24–25.

is connected "with an act pursuant to a federal officer's directions," because "[t]he challenged activities at issue in this jurisdictional dispute are, almost to a one, related to WWII efforts and/or regulatory directives." *Id.* at *9.[14]

With respect to the "acting under" element in this case, the facts supporting federal-officer removal are further demonstrated in the Declaration of Alfred M. ("A.J.") Gravel, attached hereto as Exhibit 1, and other appended exhibits. For example:

- Between 1942 and 1945, The California Company drilled eight wells in the Barataria field.[15]

- The California Company produced approximately 4.7 million barrels of crude in Barataria during WWII, with its annual production increasing 23% between 1942 and 1945.[16]

- The Petroleum Administration for War ("PAW") designated Barataria as a critical field, in part because Barataria yielded a "preferential type crude used for making aviation gasoline" and other critical war products.[17]

- In June 1945, The California Company received from PAW an exception to Petroleum Administrative Order No. 11, a key wartime conservation order, to drill a well in Barataria, after noting that the oil produced in Barataria was run "via pipeline to the Texas Company's Port Arthur refinery."[18]

- The California Company transported Barataria crude to The Texas Company's Port Arthur refinery, which manufactured 100- and 91-octane avgas, as well as other critical war products, under contract with the federal government.[19]

---

[14] In contrast to the *Riverwood* district court, the *Auster* district court concluded that the "connection" prong was not satisfied. *See Cameron v. Auster Oil & Gas Inc.*, No. 2:18-CV-00677, 2022 WL 17852581, at *9 (W.D. La. Dec. 22, 2022). The removing Defendant respectfully submits that the *Riverwood* district court reached the correct conclusion.

[15] *See* Ex. 2 (Well SN 27230 Well File); Ex. 3 (Well SN 27412 Well File); Ex. 4 (Well SN 28665 Well File); Ex. 5 (Well SN 29088 Well File); Ex. 6 (Well SN 29801 Well File); Ex. 7 (Well SN 30080 Well File); Ex. 8 (Well SN 30302 Well File); Ex. 9 (Well SN 30308 Well File).

[16] Declaration of Alfred M. ("A.J.") Gravel, Ex. 1, ¶ 215 ("Gravel Declaration").

[17] Gravel Declaration ¶ 227.

[18] Gravel Declaration ¶ 217.

[19] Gravel Declaration ¶¶ 218–227.

- During WWII, The Texas Company's Port Arthur refinery produced 14.2 million barrels of 100-octane avgas and 2.6 million barrels of 91-octane avgas.[20]

Collectively, these facts (and many others in the record) show that The California Company was "acting under" the direction of federal officers in two ways. *First*, The California Company had an unusually close and special relationship with the federal government during WWII because The California Company produced oil required to fulfill government contracts to fuel the war effort under PAW's direction, guidance and control. *See Watson*, 551 U.S. at 151, 153.[21] *Second*, The California Company was a federal subcontractor because it supplied crude oil—the essential ingredient to produce avgas—to The Texas Company's refinery in Port Arthur, which produced millions of barrels of avgas and other critical wartime refined petroleum products under contract with the federal government.[22]

Plaintiffs challenge the production methods The California Company used, pursuant to the federal government's wartime directives, in Barataria to produce the crude oil that it supplied to The Texas Company's Port Arthur refinery. Plaintiffs allege that The California Company's oil-production practices in Barataria violated state law because they were in "bad faith" and therefore not "legally commenced"[23]:

- **High Production Rates**. Plaintiffs allege that Defendants should not have extracted oil at the high production rates they maintained during the war, because that production "generated accelerated wave action that erodes levees and destroys marshes."[24] Slowing production rates would have caused less

---

[20] Gravel Declaration ¶ 228.
[21] *See* Brief of Defendants-Appellants at 40–52, *Plaquemines Parish v. Chevron USA, Inc. (Plaquemines II)*, No. 22-30055 (5th Cir.) ("Defs. App. Br.") (explaining the nature of the federal government's wartime relationship with oil companies such as The California Company).
[22] *See* Defs. App. Br. at 62–72 (outlining legal framework confirming that suppliers of crude-oil to federal-contractor refineries, like The California Company, were federal subcontractors).
[23] *See Rozel* Expert Report at 68, 82–83, ECF No. 1-3.
[24] *Rozel* Expert Report at 13, ECF No. 1-1.

crude to be extracted and shipped to refineries producing war products under federal contract.

- **Vertical Wellbores**. Plaintiffs allege that Defendants should have drilled wells directionally from a centralized location, rather than spacing wells and drilling vertically into oil reservoirs.[25] Plaintiffs' preferred practice would have slowed the production and shipping of crude to federally contracted refiners particularly given the limitations of directional drilling technology at the time. It also would have required the use of far more critical restricted materials (especially steel) and violated federal directives that mandated all wells be drilled vertically and uniformly spaced at one oil well to each 40 surface acres.[26]

- **Earthen Pits**. Plaintiffs allege that Defendants should have used individual saltwater disposal tanks at each well site, instead of earthen pits and flowlines to central tank batteries, which Plaintiffs claim "leaked and seeped waste, produced saltwater and hydrocarbons into the marsh."[27] Constructing steel tanks for each well site would, of course, have required the use of extensive amounts of steel, in direct contravention of federal directives to minimize the use of steel and other critical wartime materials.[28]

- **Disposal of Saltwater**. Plaintiffs fault Defendants for not using saltwater disposal "wells . . . at the onset of saltwater production" in the field, because Plaintiffs claim that "overboard discharges were contrary to industry knowledge and prudent practices and killed the marsh."[29] But saltwater disposal wells would have required voluminous amounts of steel casing, and federal wartime priorities did not permit steel to be used for such purposes.[30]

- **Tubing Thickness**. Plaintiffs allege that Defendants "design[ed] wells, production flowlines, etc. with minimum and inadequate tubular wall thicknesses," which resulted in "failures that caused leaks and spills that caused pollution."[31] But using thicker tubing would have required the use of extra steel, which would have undermined federal directives to minimize the use of steel.[32]

- **Dredging Canals**. Plaintiffs criticize Defendants for their pre-1980 dredging of "a maze of canals accessing each and every drilling site, both productive and

---

[25] *See Rozel* Expert Report at 13, ECF No. 1-1; *Rozel* Expert Report at 125, ECF No. 1-4.

[26] *See* Gravel Declaration ¶¶ 49, 55–56.

[27] *Rozel* Expert Report at 68, ECF No. 1-3; *Rozel* Expert Report at 125–26, ECF No. 1-4.

[28] *See, e.g.*, Gravel Declaration ¶¶ 43, 48.

[29] *Rozel* Expert Report at 126, ECF No. 1-4.

[30] Under Conservation Order M-68, steel could not be used for "[m]aterial to be used for pumping or artificial lifting equipment." Ex. 1-202 to Gravel Declaration, § 1047.1(c)(5). Likewise, under Petroleum Administrative Order No. 11, steel could be used in some circumstances for "salt water disposal or injection equipment" but not for the disposal well itself or flow, lead, and gathering lines from the well. Ex. 1-210 to Gravel Declaration, § 1515.6(b)(9)

[31] *See Rozel* Expert Report at 14, ECF No. 1-1.

[32] *See, e.g.*, Gravel Declaration ¶¶ 43, 48.

dry, that . . . collectively [led] to marsh collapse over the entire area covered by the maze *and even kilometers beyond*."[33] Instead, Plaintiffs suggest that Defendants should have constructed "networks of roads with drainage opening to protect the marsh from erosion."[34] But wartime federal directives severely constrained the use of roads because asphalt was heavily restricted.

Plaintiffs' alleged "prudent practices" would have burdened and reduced the removing Defendant's crude oil production and required the use of critical restricted materials like steel and asphalt, in direct contravention of the federal government's directive to "maxim[ize] production of petroleum . . . with a minimum expenditure of material."[35] *See Riverwood*, 2022 WL 101401, at *9 ("The challenged activities at issue in this jurisdictional dispute are, almost to a one, related to WWII efforts and/or regulatory directives."). And slowed production in the fields would undoubtedly have been contrary to federal government directives to federally contracted refiners to "greatly increase[ ]" their production of avgas and other petroleum-based war products for sale to the government.[36]

For these reasons and those explained in the *Plaquemines II* briefs, the removing Defendant is entitled to federal-officer removal in this case. Because, as noted above, these issues are the subject of the petition for a writ of certiorari in *Plaquemines II*, this Court may wish to defer consideration of Plaintiffs' remand motion pending resolution of the Supreme Court's review. In addition to the petition for a writ of certiorari in *Plaquemines II*, two other petitions for a writ of certiorari currently under consideration by the Supreme Court present issues concerning federal-officer jurisdiction that would affect certain of the jurisdictional issues in this case: *Tyson Foods,*

---

[33] *Rozel* Expert Report at 52, ECF No. 1-2 (emphasis added).
[34] *Rozel* Expert Report at 83, ECF No. 1-3.
[35] Gravel Declaration ¶ 48.
[36] Gravel Declaration ¶ 15; *cf. Exxon Mobil Corp. v. United States,* No. CV H-10-2386, 2020 WL 5573048, at *7 (S.D. Tex. Sept. 16, 2020) ("[T]he government's emphasis on maximum efficiency in producing avgas and other wartime products required Exxon to defer or forego maintenance and repairs that would require shutting down all or part of the refinery and related facilities.").

*Inc. v. Buljic*, 22-70 (U.S.), and *Tyson Foods, Inc. v. Glenn*, 22-455 (U.S.).[37] Accordingly, deferring consideration of Plaintiffs' motion to remand until the Supreme Court resolves the petitions in the *Tyson* cases and *Plaquemines II*, even after receiving the parties' briefing, would conserve judicial resources and be in the interests of justice. Another section of this Court has already denied motions to reopen two administratively closed cases without prejudice to re-urging the motions after the Supreme Court "either issues a final denial of the petition for certiorari or renders final judgment in the *Riverwood* matter." *Plaquemines Par. v. Rozel Operating Co.*, No. 18-CV-05189, ECF No. 58 (E.D. La. Dec. 29, 2022); *Plaquemines Par. v. Hilcorp Energy Co.*, No. 18-CV-05210, ECF No. 91 (E.D. La. Dec. 29, 2022).

## II.   Under *Plaquemines II*, Federal-Officer Jurisdiction Exists in this Case.

As noted above, the Fifth Circuit's decision in *Plaquemines II* indicated that "refineries who had federal contracts and acted pursuant to those contracts can likely remove under § 1442." *See Plaquemines II*, 2022 WL 9914869, at *4. Federal-officer jurisdiction thus exists if a removing defendant both produced crude oil *and* then refined that crude oil to fulfill government contracts during WWII. The Texas Company, Gulf Oil Corporation ("Gulf"), and Tide Water Associated Oil Company ("Tide Water")—predecessor entities to removing Defendant Chevron U.S.A. Inc.— acted *both* as crude-oil producers *and* refiners, who used oil from their own fields to fulfill their contracts with the federal government to produce critical war products (such as avgas), in ten cases in this District related to this case (*i.e.*, the Related Refinery Cases). The attached Gravel Declaration describes The Texas Company's, Gulf's, and Tide Water's WWII activities in each of the fields identified in the Related Refinery Cases: (1) *Parish of Plaquemines v. Rozel Operating*

---

[37] The petitions for writ of certiorari in the *Tyson* cases seek review of decisions by the Eighth and Fifth Circuits, respectively, finding that federal-officer jurisdiction was not present in cases where a private actor assisted the federal government in securing the national food supply during a national emergency.

*Co.*, 2:18-CV-05189; (2) *Parish of Jefferson v. Destin Operating Co.*, 2:18-CV-05206; (3) *Parish of Plaquemines v. Exchange Oil & Gas Corp.*, 2:18-CV-05215; (4) *Parish of Jefferson v. Chevron U.S.A. Holdings Inc.*, 2:18-CV-05224; (5) *Parish of Plaquemines v. Great Southern Oil & Gas Co.*, 2:18-CV-05227; (6) *Parish of Plaquemines v. Northcoast Oil Co.*, 2:18-CV-05228; (7) *Parish of Plaquemines v. Devon Energy Production Co.*, L.P., 2:18-CV-05234; (8) *Parish of Plaquemines v. Apache Oil Corp.*, 2:18-CV-05240; (9) *Parish of Jefferson v. Atlantic Richfield Co.*, 2:18-CV-05246; and (10) *Parish of Plaquemines v. Total Petrochemicals & Refining USA, Inc.*, 2:18-CV-05256.[38]

As explained below, Plaintiffs allege that the removing Defendant's WWII-production activities in the operational areas in the Related Refinery Cases contributed to and exacerbated the land loss and other injuries allegedly caused by the removing Defendant's activities in the operational area in this case.[39] Thus, if the Related Refinery Cases were properly removed—and the removing Defendants in those cases have shown that they were—it follows that this case, in which Plaintiffs seek to recover damages that were allegedly caused by the same activity, is also a suit against a Defendant that was acting under a federal officer, and thus was properly removed under 28 U.S.C. §1442(a).

> **a. Plaintiffs' *Rozel* Expert Report Alleges Damage in the Operational Area Caused by Wartime Activities in Other Coastal Areas.**

Consistent with Plaintiffs' allegations, this removal on federal-officer grounds is not dependent on or limited to the WWII-era activities in the operational area, which Plaintiffs drew solely for the purpose of this litigation. Plaintiffs' *Rozel* Expert Report sets out theories of land-

---

[38] *See* Gravel Declaration ¶¶ 76–214. The briefing and evidence in support of remand in these cases is incorporated herein.
[39] The Fifth Circuit held that removal based on *Rozel* Expert Report "was timely." *Plaquemines I*, 7 F.4th at 365.

loss liability and causation that make clear that Plaintiffs seek to hold Defendants liable for activities that extend beyond the bounds of the particular operational area in this case.[40] For example, the *Rozel* Expert Report argues that the combined effects of the removing Defendant's oil-and-gas activities beyond the operational area—which includes significant federally-directed WWII activities—have weakened the marsh and created pathways for hurricanes and storm surges to have more harmful impacts within the operational area in this case:

- "Oil companies weakened the marsh by discharging millions of barrels of produced water and created impoundments and impediments to marsh hydrology. The hurricane(s) would not have had such a devastating impact if the oil companies had not violated the CZM program."[41]

- "[I]n coastal wetlands with anthropogenic modifications such as pipeline canals and oil field canals, hurricane impacts can be detrimental by disrupting and weakening the marsh sediments, changing surface elevations, providing preferred pathways for high-velocity flows, impeding post-storm floodwater drainage, and prolonged saltwater intrusion."[42]

- "All of these impacts weakened the wetland complex and made this area much more susceptible to erosion and to the negative impacts of hurricanes."[43]

- "The indirect effects on marsh vegetation contribute to the weakening of the marsh that make it more susceptible to damage or destruction during severe storm events, such as hurricanes."[44]

The *Rozel* Expert Report similarly details allegedly unlawful activities in the "hydrological area," not the Plaintiff-drawn "operational area."[45] The *Rozel* Expert Report further argues that all of the removing Defendant's WWII activities are encompassed by Plaintiffs' "cumulative effects" theory:

---

[40] Defendants dispute Plaintiffs' theories and reserve the right to contest them on the merits.
[41] *Rozel* Expert Report at 117, ECF No. 1-4.
[42] *Rozel* Expert Report at 124, ECF No. 1-4.
[43] *Rozel* Expert Report at 116, ECF No. 1-4.
[44] *Rozel* Expert Report at 118, ECF No. 1-4.
[45] *See Rozel* Expert Report at 47–53, *see also* ECF No. 1-3; *Rozel* Expert Report at 117, ECF No. 1-4, at 117–24 (discussing Plaintiffs' claims based on "Storm Impact on Weakened Marsh" across "hydrologic basins").

> Over time it is highly likely that there has been significant impact change of any exempted [pre-1980] use since it was initiated. For example, subsidence, erosion, land loss, flooding, maintenance activities, boat wakes, sinking of spoil banks, widening of canals, loss of vegetation, spreading of pollution and waste plumes from discharge of oil and produced water, etc. *are dynamic processes that change over time* and are impacts attributable to oil and gas activities. Cumulative impacts *from the interaction of multiple activities and impacts also increase over time.*[46]

Crucially, Plaintiffs do not suggest anywhere that these various alleged effects are contained within the boundaries of the operational area in any particular case. To the contrary, when complaining about the removing Defendant's canal-dredging activity, Plaintiffs expressly allege that the effects of that activity are alleged to have extended "kilometers beyond" the specific operational areas in which those activities occurred.[47]

Plaintiffs' own Petition further shows that Plaintiffs seek to hold the removing Defendant liable for activities extending beyond the operational area in this case. *See* Petition for Damages to the Jefferson Parish Coastal Zone, *Par. of Jefferson v. Canlan Oil Co.*, No. 732-771 (requesting a judgment "ordering the payment of costs necessary to clear, revegetate, detoxify and otherwise restore the *Jefferson Parish Coastal Zone* as near as practicable to its original condition" and "requiring actual restoration of the *Jefferson Parish Coastal Zone* to its original condition." (emphasis added)); *see also Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999) (requiring courts to credit the removing defendant's theory of the case when evaluating the propriety of federal-officer removal). Plaintiffs served their *Rozel* Expert Report after a Louisiana court ordered "that the parishes provide specific details of the [defendant] companies' alleged violations of SLCRMA" because of how broad and vague the functionally-identical Petitions were. *Plaquemines I*, 7 F.4th at 366. And the Fifth Circuit found that the *Rozel* Expert Report set forth new theories of liability allowing for a new period for removal. *See id.* at 368. This Court should

---

[46] *Rozel* Expert Report at 28, ECF No. 1-1. (emphases added).
[47] *Rozel* Expert Report at 52, ECF No. 1-2.

reject Plaintiffs' belated attempts to divorce the *Rozel* Expert Report's allegations from their own Petition because the *Rozel* Expert Report's allegations plainly bear on "the subject matter of" Plaintiffs' Petition. *Watson*, 551 U.S. at 147.[48]

Additionally, a later suit filed by the City of New Orleans, which raises many of the same theories regarding land loss that Plaintiffs advance in their *Rozel* Expert Report, buttresses the removing Defendant's understanding of the scope of Plaintiffs' allegations in this case. *See, e.g.*, Petition for Damages and Injunctive Relief and Damages Under the Louisiana State and Local Coastal Resources Management Act ¶ 13.11, *City of New Orleans v. Apache La. Minerals LLC*, No. 19-3466 ("[T]he City is imperiled by the damage to the wetlands *in the coastal zone of these Parishes situated between Orleans Parish and the Gulf of Mexico*, as coastal uses by the Defendants turn once healthy marsh into open water, *leaving an open path for storm surge and erosive forces right up to the City's doorstep*." (emphasis added)). Put simply, Plaintiffs' own theories of causation and land loss do not respect any lawyer-drawn lines and encompass oil-and-gas development and production beyond the operational area in this case.

The removing Defendant engaged in extensive oil-and-gas operations during WWII acting under the direction of federal officers in the fields identified in the Related Refinery Cases. Those activities include drilling dozens of wells, producing tens of millions of barrels of crude oil, and transporting that oil to its own refineries that produced 100-octane avgas, 91-octane avgas, and other critical war products under contract with the federal government. Consider the following non-exhaustive examples:

- Garden Island Bay Field: The Texas Company, predecessor to Chevron U.S.A. Inc., produced more than five million barrels of oil in Garden Island Bay[49] and

---

[48] Plaintiffs misread *Watson*, which did not "limit[ ] federal officer removal" to the specific "conduct alleged in the complaint." ECF No. 46-2 at 3.
[49] Gravel Declaration ¶ 75.

transported that oil to The Texas Company's refinery in Port Arthur, Texas.[50] The Texas Company obtained from PAW exceptions to drill a total of six wells, after informing PAW that the oil from those wells supplied The Texas Company's federally contracted refineries.[51] PAW recognized that The Texas Company's Port Arthur refinery was "making war products from every barrel of crude coming from Southern Louisiana," including from Garden Island Bay and numerous other fields (such as Lafitte, discussed below).[52] The Texas Company's refinery in Port Arthur produced massive quantities of critical war products—including millions of barrels of 100- and 91-octane avgas—under contract with the federal government.[53] The Texas Company even expanded its avgas-production facilities with federal financing.[54]

- Quarantine Bay Field: Gulf, predecessor to Chevron U.S.A. Inc., produced more than five million barrels of oil in Quarantine Bay[55] and transported that crude to, among other places, Gulf's refinery in Port Arthur.[56] Gulf obtained from PAW an exception to recomplete a well in Quarantine Bay, with PAW finding that the project was "necessary and appropriate in the public interest and to promote the war effort."[57] In 1942, Gulf reported to PAW that crude moving westward from Louisiana to the Port Arthur refinery was "mostly used for war products."[58] Gulf's refinery in Port Arthur also produced huge quantities of critical war products—including millions of barrels of 100- and 91-octane avgas—under contract with the federal government.[59] And, like The Texas Company, Gulf also expanded its avgas-production facilities with financing from the federal government.[60]

- Venice Field: Tide Water, predecessor to Chevron U.S.A. Inc., produced approximately ten million barrels of crude in Venice.[61] Tide Water obtained from PAW exceptions to drill a total of thirteen wells, with PAW finding that the projects were "necessary and appropriate in the public interest and to promote the war effort."[62] Tide Water also obtained from PAW an exception to construct a 7-inch gathering line from the field to a nearby barge terminal,[63] which was necessary because annual production in Venice more than doubled

---

[50] Gravel Declaration ¶¶ 79–81, 83–86.
[51] Gravel Declaration ¶¶ 76–77.
[52] Gravel Declaration ¶ 82.
[53] Gravel Declaration ¶ 90.
[54] Gravel Declaration ¶ 89.
[55] Gravel Declaration ¶ 92.
[56] Gravel Declaration ¶ 95, 97–98.
[57] Gravel Declaration ¶ 94.
[58] Gravel Declaration ¶ 99.
[59] Gravel Declaration ¶ 102.
[60] Gravel Declaration ¶ 101.
[61] Gravel Declaration ¶ 154.
[62] Gravel Declaration ¶¶ 155, 157.
[63] Gravel Declaration ¶ 158.

during WWII.[64] Tide Water's Venice crude was transported to, among other places, its refinery in Bayonne, New Jersey,[65] which manufactured significant quantities of avgas and other critical war products under contract with the federal government.[66] Tide Water also reported that Venice crude was "ideally suited for processing" into 100-octane avgas.[67]

- Lafitte Field: The Texas Company produced more than 17 million barrels of crude oil in Lafitte,[68] which, as explained above, was transported to The Texas Company's Port Arthur refinery to be used in producing critical war products.[69] PAW also recognized that Lafitte was a critical field to the war effort because the field had "substantial production" that yielded a "preferential type[ ] crude used for making aviation gasoline" and other critical war products.[70]

Plaintiffs have thus alleged that WWII activities in fields where a removing Defendant was both a federally-contracted refiner and a crude-oil producer caused damage in other operational areas along the coast, including the area at issue here. Accordingly, federal-officer jurisdiction lies in this case as well as in the cases where the removing Defendant both produced and then refined its own crude to fulfill government contracts during WWII. The removing Defendant has supplemented the record to oppose Plaintiffs' motion to remand for this additional reason, and respectfully request that the Court deny the motion.

Alternatively, at a minimum, this Court should hold this case in abeyance pending resolution of Plaintiffs' motions to remand in the Related Refinery Cases, which present facts demonstrating that removal is proper based on an activity that the Fifth Circuit expressly recognized would likely give rise to federal-officer jurisdiction under Section 1442(a). Doing so would not unduly delay this case and would preserve judicial resources.

---

[64] Gravel Declaration ¶ 154.
[65] Gravel Declaration ¶¶ 159–163.
[66] Gravel Declaration ¶¶ 159, 164, 166.
[67] Gravel Declaration ¶ 162.
[68] Gravel Declaration ¶ 200.
[69] Gravel Declaration ¶¶ 202–213.
[70] Gravel Declaration ¶ 201

### b. Plaintiffs' Arguments Concerning the Related Refinery Cases Are Meritless.

Plaintiffs claim that federal-officer jurisdiction does not exist in the Related Refinery Cases, but in doing so they by mischaracterize the removing Defendants' arguments in the Related Refinery Cases, misstate the law, and incorrectly represent the facts of the Related Refinery Cases.

***First***, Plaintiffs claim that the "acting under" prong is not satisfied in the Related Refinery Cases "because there are no proven federal directions of crude production in this case in the first place."[71] Plaintiffs rely on *St. Charles Surgical Hospital, L.L.C. v. Louisiana Health Service & Indemnity Co. (St. Charles II)*, 990 F.3d 447 (5th Cir. 2021), for support that "[a] refinery's acts under a federal officer are the acts of the refinery, not any crude oil operator, . . . even when crude oil production operations are owned by the same corporate entity that refines its own crude under a government contract."[72] Those arguments miss the point. To remove the Related Refinery Cases, The Texas Company, Gulf, and Tide Water did not need to be "acting under" federal officers when producing crude oil in the fields at issue. *See, e.g., id.* at 454 ("In order to satisfy the 'acting under' requirement, a removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive.").[73] Instead, as Fifth Circuit precedent confirms, the Related Refinery Cases are removable as long as The Texas Company's, Gulf's, and Tide Water's crude-

---

[71] ECF No. 46-2 at 6 (emphasis omitted).

[72] ECF No. 46-2 at 8.

[73] Plaintiffs further misread *St. Charles II* in contending that "Section 1442 jurisdiction requires that the complaint include 'federally governed claims.'" ECF No. 46-2 at 8 (emphasis omitted) (quoting *St. Charles II*, 990 F.3d at 454). *St. Charles II* involved an insurance company's payment of *health insurance claims*, some of which were for patients insured under the Federal Employees Health Benefits Act ("FEHBA"). *St. Charles II*'s reference to "federally governed claims" therefore did not mean that the claims *in the lawsuit* were "federally governed"; rather, it was a description of the underlying *insurance* claims, to distinguish the "federally governed" insurance claims from insurance claims by patients insured under other, non-federal insurance plans. *See id.* at 449, 455 (explaining that "St. Charles produced discovery documents that detailed individual patient transactions at issue in the litigation" among which were documents that the insurer contended "contained 'dozens' of claims that implicated FEHBA-governed insurance benefits" and noting that the district court could "conclud[e] that St. Charles's complaint does not include any federally-governed claims, because the discovery disclosures to the contrary were inadvertent").

oil-production practices in those fields are *related to* their actions as government-contracted refiners acting under the federal government to make and deliver crude-oil-based war products. *See, e.g.*, *Latiolais*, 951 F.3d at 292 ("[S]ection 1442(a)(1) makes removable to federal court 'a civil action . . . that is against or directed to . . . any person acting under a federal officer . . . for or *relating to any act* under color of such office.'" (quoting 28 U.S.C. § 1442(a)(1) (emphasis added)). It is irrelevant whether, as Plaintiffs claim, producing crude oil "has 'always been a private task'" or the federal government "would never have had to produce crude oil" during World War II.[74] The salient point is that the government entered into contracts directing The Texas Company, Gulf, and Tide Water to produce vast quantities of war products that the government needed during the war, and the Related Refinery Cases challenge The Texas Company's, Gulf's, and Tide Water's crude-oil production activities that are related to their production of those war products as federal contractors.

Plaintiffs posit that the Fifth Circuit has already rejected "essentially the same refinery-based argument" in *Plaquemines II* that The Texas Company, Gulf, and Tidewater are advancing in the Related Refinery Cases.[75] Not so. Instead, in *Plaquemines II*, the Fifth Circuit only considered defendants' arguments that Humble "acted under" federal officers in its capacity as a *crude-oil producer* because (1) it had an "unusually close and special relationship" with the federal government to produce crude oil during the war; and (2) it was a federal subcontractor because it was a crude-oil supplier to federally contracted refiners. *See Plaquemines II*, 2022 WL 9914869, at *2. In the Related Refinery Cases, The Texas Company, Gulf, and Tide Water are asserting that they "acted under" federal officers in their capacities as *federally-contracted avgas refiners* and that their crude-oil-production practices in the fields at issue were related to their actions as

---

[74] ECF No. 46-2 at  13–14.
[75] ECF No. 46-2 at 11.

refiners.[76] That difference is crucial and underscores why the Related Refinery Cases are factually distinct from *Plaquemines II*. Put simply, the connection between the charged conduct and the actions under federal officers is stronger in the Related Refinery Cases because The Texas Company, Gulf, and Tide Water were integrated oil companies with interconnected production and refining operations.

**Second**, Plaintiffs contend that the "colorable federal defense" requirement for federal-officer removal is not satisfied in the Related Refinery Cases because a removing defendants' federal defenses must arise out of their actions under color of federal office.[77] This contention fails. The Fifth Circuit has explained that the reason for the "colorable federal defense" prong is simply to ensure that the constitutional minimum for federal jurisdiction over the case—a federal question to be decided—is present. *See, e.g.*, *Zeringue v. Crane Co.*, 846 F.3d 785, 789–90 (5th Cir. 2017). And in *Butler v. Coast Electric Power Association*, 926 F.3d 190, 195–200 (5th Cir. 2019), the Fifth Circuit specifically approved as a "colorable federal defense" a preemption defense that applied to the requested remedy but that did not relate to the official acts that gave rise to "acting under" status. Thus, the premise of Plaintiffs' argument is wrong.

Plaintiffs' argument is also undercut by the text of Section 1442(a) and the Fifth Circuit's interpretation of it in *Latiolais*. The statute's plain text permits removal of any civil action "for or *relating to* any act under color" of federal office. 28 U.S.C. § 1442(a)(1) (emphasis added). Even if something more than the constitutional minimum for federal jurisdiction were required, therefore, at most a removing defendants' colorable federal defenses would need only be tied to conduct *related to* an act under color of federal office. Plaintiffs' conception of the "colorable

---

[76] Contrary to what Plaintiffs suggest, The Texas Company, Gulf, and Tide Water are, in no way, claiming that "a defendant subject to any federal direction, however limited, 'acts under' federal officers for everything he does." ECF No. 46-2 at 17.
[77] *See* ECF No. 46-2 at 16–17.

federal defense" requirement would effectively reimpose the "causal nexus" test that the Fifth Circuit expressly jettisoned in *Latiolais*. *See Latiolais*, 951 F.3d at 296 (overruling past cases that "erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to'").

Plaintiffs' reliance on a 1981 Supreme Court case articulating a "historical[]" purpose of Section 1442 is unavailing.[78] That case addressed the statute prior to its amendment in 2011, when Section 1442 allowed removal of a civil action "for any act under color of [federal] office." But Congress amended that language in 2011 to allow removal of a civil action "for *or related to* any act under color of [federal] office." Congress thus "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected or associated*, with acts under color of federal office." *Id.* at 292. In short, The Texas Company, Gulf, and Tide Water (through their successor, removing Defendant Chevron U.S.A. Inc.) have raised several colorable federal defenses to Plaintiffs' claims in the Related Refinery Cases. *See Riverwood*, 2022 WL 101401, at *6–7 (finding that the defendants had alleged "colorable" federal-preemption and due-process defenses, which The Texas Company asserts here). The "colorable federal defense" prong is satisfied.

In sum, the removing Defendants in the Related Refinery Cases have demonstrated that those cases were properly removed under Section 1442(a)(1) because: (1) The Texas Company, Gulf, and Tide Water were acting under federal officers by virtue of their avgas-production and other-petroleum-refining operations at their refineries under contract with the federal government; (2) the charged conduct, *i.e.*, The Texas Company's, Gulf's, and Tide Water's crude-oil-

---

[78] *See* ECF No. 46-2 at 16 (citing *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)). It is a hornbook principle, however, that "purpose cannot trump statutory language." *Hammack v. Baroid Corp.*, 142 F.3d 266, 271 (5th Cir. 1998).

production activities in the fields at issue, is closely connected (*i.e.*, related ) to those federal refining contracts; and (3) The Texas Company, Gulf, and Tide Water have asserted federal defenses to Plaintiffs' claims. *See Latiolais*, 951 F.3d at 296. Plaintiffs' arguments attempting to discount the Fifth Circuit's clear statement that "refineries, who had federal contracts and acted pursuant to those contracts, can likely remove under § 1442" are meritless. *Plaquemines II*, 2022 WL 9914869, at *4.

## CONCLUSION

For the foregoing reasons, the removing Defendant respectfully submits that Plaintiffs' motion to remand should be denied. At a minimum, the resolution of Plaintiffs' motion to remand should be deferred pending (1) the Supreme Court's resolution of the petitions for a writ of certiorari in the *Tyson* cases and *Plaquemines II* and (2) resolution of the motions to remand in the Related Refinery Cases.

Dated: February 8, 2023      Respectfully submitted:

*/s/ Alexandra White*

Alexandra White (#29478)
lwhite@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
Eric J. Mayer (#14184)
emayer@susmangodfrey.com
Johnny W. Carter (#37985)
jcarter@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

**KEAN MILLER LLP**
Charles S. McCowan III (#19699)
trey.mccowan@keanmiller.com
Pamela R. Mascari (#25162)
pam.mascari@keanmiller.com
II City Plaza
400 Convention St., Suite 700
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70802
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

-and-

**KEAN MILLER LLP**
Michael R. Phillips (#21020)
mike.phillips@keanmiller.com
Claire E. Juneau (#33209)
claire.juneau@keanmiller.com
909 Poydras, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
Facsimile: (504) 585-3951

**Attorneys for Chevron U.S.A. Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2023 a copy of the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Alexandra White*
Alexandra White